Jessica **SHANER**, on behalf of herself and all others similarly situated, Plaintiff

v.

**CHASE BANK, USA, N.A., Defendant.**

**Civil Action No. 07–11766–GAO.**

United States District Court, D. Massachusetts.

Aug. 8, 2008.

Barry L. Kramer, Law Offices of Barry L. Kramer, Los Angeles, CA, David Pas-tor, Gilman and Pastor, LLP, Boston, MA, for Plaintiff.

Robert S. Stern, Nancy R. Thomas, Morrison & Foerster LLP, Los Angeles, CA, David Bliss Wilson, Robinson & Cole, LLP, Boston, MA, for Defendant.

*OPINION AND ORDER*

O'TOOLE, District Judge.

Jessica Shaner opened a credit card account with Chase Bank, USA, N.A. ("Chase"), in 2001. The terms of the account were governed by a Cardmember Agreement. Chase reserved the right to amend the terms from time to time, and it did so with respect to Shaner's account once in 2004. As amended, the Cardmember Agreement specified the circumstances that would permit Chase to deem the account in default and further provided:

> "If any of these events occurs, we may increase the APRs (including any promotional APR) on all balances up to a maximum of the default rate stated in the Rates and Fees Table.... The default rate will take effect as of the first day of the billing cycle in which the default occurs, and will apply to purchase balances from the previous billing cycle for which periodic finance charges have not been already billed."

(2004 Change–in–Terms Notice 5.)

In December 2005, Chase deemed Shaner's account to be in default and increased the interest rates applicable to the account effective as of the beginning of that month's billing cycle.[1] Although the retroactive assessment of interest to the beginning of the billing cycle was consistent with the above-quoted term of the Cardmember Agreement, Shaner contends in her complaint that Chase's action violated

---

1. For the month of December, Chase charged Shaner an annual percentage rate ("APR") of 28.24% for both purchases and cash advances, representing increases over the previous billing cycle of 8.25% for purchases and 5.25% for cash advances.

the Truth in Lending Act ("TILA"), 16 U.S.C. § 1601 *et seq.,* as well as the Massachusetts consumer protection statute, Mass.Gen.Laws ch. 93A ("Chapter 93A"). She also complains that the retroactive assessment of interest is an unlawful penalty under common law principles. She alleges:

This case arises out of Chase's business practice of reviewing its credit card accounts at the end of each account's billing cycle, targeting selected cardholders for interest rate increases as a result of such review, and then imposing *backdated* rate increases and additional finance charges on these accounts. Chase implements this practice by reviewing each account on a monthly basis, using a secret methodology in order to determine whether or not to increase the interest rates and finance charges for the billing cycle just ended. In the event Chase decides to impose a rate increase, Chase *backdates the effective date of the rate increase* by approximately one month (to the first day of the billing cycle just ended), and *recalculates the accrued finance charges for that billing cycle* at the new, higher rate. As a result of this practice, the impacted customers incur a penalty charge in the form of one whole month's additional interest at the increased rate, before they can even discover that the new rate has gone into effect.

(First Am. Compl. ¶ 5.)

Congress enacted TILA to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). While the statute itself does not expressly address when and how no-

tice of changes in terms must be given, implementing regulations adopted by the Federal Reserve Board do. The Board's Regulation Z provides:

Written notice required. Whenever any term required to be disclosed under § 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed or delivered at least 15 days prior to the effective date of the change. The 15–day timing requirement does not apply if the change has been agreed to by the consumer, or if a periodic rate or other finance charge is increased because of the consumer's delinquency or default; the notice shall be given, however, before the effective date of the change.

12 C.F.R. § 226.9(c)(1).

From the last sentence of the excerpt just quoted, it would seem that Chase would be required to notify Shaner not later than the effective date of the change, *viz.,* the beginning of the monthly billing cycle, that her interest rates were being increased because of her delinquency or default, rather than almost at the end of the cycle, when she received her statement and learned of the retroactive change. This would seem to be confirmed by Comment 3 to § 226.9(c)(1), which states:

Timing—advance notice not required. Advance notice of 15 days is not necessary—that is, a notice of change in terms is required, but it may be mailed or delivered as late as the effective date of the change—in two circumstances:

• If there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default.

• If the consumer agrees to the particular change. This provision is intended

for use in the unusual instance when a consumer substitutes collateral or when the creditor can advance additional credit only if a change relatively unique to that consumer is made, such as the consumer's providing additional security or paying an increased minimum payment amount. Therefore, the following are not "agreements" between the consumer and the creditor for purposes of §·226.9(c)(1): The consumer's general acceptance of the creditor's contract reservation of the right to change terms; the consumer's use of the account (which might imply acceptance of its terms under State law); and the consumer's acceptance of a unilateral term change that is not particular to that consumer, but rather is of general applicability to consumers with that type of account.

*Id.* § 226.9(c)(1), cmt. 3.

But another comment to the same section of Regulation Z casts some doubt on the question. Comment 1 to § 226.9(c)(1) describes circumstances where *no* notice of a change in terms is necessary, whether 15 days in advance or as late as the effective date of the change:

> "Changes" initially disclosed. No notice of a change in terms need be given if the specific change is set forth initially, such as: Rate increases under a properly disclosed variable-rate plan, a rate increase that occurs when an employee has been under a preferential rate agreement and terminates employment, or an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum. In contrast, notice must be given if the contract allows the creditor to increase the rate at its discretion but does not include specific terms for an

increase (for example, when an increase may occur under the creditor's contract reservation right to increase the periodic rate). The rules in § 226.5b(f) relating to home equity plans, however, limit the ability of a creditor to change the terms of such plans.

*Id.* § 226.9(c), cmt. 1. Chase interprets Comment 1 to excuse notice of a change in interest rates where the Cardmember Agreement provides that the rates may be increased up to the maximum APR upon default or delinquency by the cardholder, arguing that such a change is a "specific" one "set forth initially," just like an adjustment in rates "under a properly disclosed variable-rate plan."

While Comment 1 does say that no notice is required when the "specific change is set forth initially," it excludes from that no-notice exception contract provisions (presumably, even those "set forth initially") that allow "the creditor to increase the rate at its discretion but does not include specific terms for an increase (for example, when an increase may occur under the creditor's contract reservation right to increase the periodic rate)." That sort of provision seems to be at issue here. Under the Cardmember Agreement, Chase retains the discretion whether to increase rates upon default or delinquency, as well as how much to raise them. It is a little difficult to see how this latitudinarian reservation qualifies as "specific terms for an increase." Shaner's Cardmember Agreement only gives notice of the possibility of such non-specific discretionary changes. The penultimate sentence of the paragraph quoted above would seem rather plainly to require notice of an actual change.

Moreover, even if Comment 1 could be read to apply generally to the provision at issue here, there would still occur the separate question of why Comment 1 should prevail in preference to Comment 3 when

both are implicated. The usual way to resolve ambiguity or conflict between competing provisions would be to pay regard to the more specific comment rather than the more general one. Comment 3 specifically addresses a change occasioned by "the consumer's delinquency or default," whereas Comment 1 refers more broadly to circumstances where the "specific change is set forth initially," as with variable rate contracts.

All that said, however, it must be acknowledged that the courts that have considered the question have generally agreed with Chase. *See Swanson v. Bank of Am., N.A.,* 566 F.Supp.2d 821, 2008 WL 2738083, at *3–5 (N.D.Ill.2008); *McCoy v. Chase Manhattan Bank USA,* SACV 06–107–JVS (C.D.Cal. Aug. 10, 2006) (order granting defendant's motion to dismiss); *Penner v. Chase Bank U.S.A., N.A.,* No. C06–5092–FDB, 2006 WL 2192435, at *1 (W.D.Wash. Aug. 1, 2006); *Evans v. Chase Manhattan Bank USA, N.A.,* No. C–05–3968–SC, 2006 WL 213740, at * 1 (N.D.Cal. Jan. 27, 2006), *affirmed Evans v. Chase Bank USA, N.A.,* No. 06–15212, 2008 WL 467801 (9th Cir. Feb. 22, 2008). These courts have held that because the Cardmember Agreement provides notice to the card holder that " 'the default rate will take effect as of the first day of the billing cycle in which the default occurs, and will apply to purchase balance from the previous billing cycle for which periodic finance charges have not been already billed,' " *Evans,* 2006 WL 213740, at *2 (quoting the Cardmember Agreement), Comment 1 is germane and no notice of the change prior to its implementation is necessary.

This resolution does not seem to take sufficient account of Comment 3's specific reference to changes as a result of a card holder's delinquency or default, and so, if there were nothing else, I would be in-

clined to take a different view. But there is something else. The staff of the Board seems itself to agree with the interpretation argued by Chase and adopted by these courts.

█ Comments 1 and 3 are part of the staff's commentary to Regulation Z. The staff commentary is "the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Regulation Z." 12 C.F.R. pt. 226, supp. I. Interpretations of the regulations by the Board and its staff are due respect, because "Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). There has been "an unmistakable congressional decision to treat administrative rulemaking and interpretation under TILA as authoritative." *Id.* at 567–68, 100 S.Ct. 790; *see also Anderson Bros. Ford v. Valencia,* 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981) ("[A]bsent some obvious repugnance to the statute, the Board's regulation implementing this legislation [TILA] should be accepted by the courts, as should the Board's interpretation of its own regulation.").

The ambiguity that is at the heart of the present controversy has led consumer advocates and others to seek a clarification of the mixed signals seemingly being sent by the staff Comments 1 and 3. As a result the Board has initiated a proposed rulemaking to address the matter. In an "Advance Notice of Proposed Rulemaking" ("ANPR") published in 2004, the staff made the following pertinent statements:

However, advance notice is not required in all cases. For example, if the interest rate or other finance charge increases due to a consumer's default or delin-

quency, notice is required, but need not be given in advance. 12 CFR 226.9(c)(1); comment 9(c)(1)–3. And no change-in-terms notice is required if the creditor specifies in advance the circumstances under which an increase to the finance charge or an annual fee will occur. Comment 9(c)–1. For example, some credit card account agreements permit the card issuer to increase the interest rate if the consumer pays late, or if card issuer learns the consumer paid late on another credit account, even if the consumer has always paid the card issuer on time. Under Regulation Z, because the circumstances are specified in advance in the account agreement, the creditor need not provide a change-in-terms notice 15 days in advance of the increase; *the new rate will appear on the periodic statement for the cycle in which the increase occurs.*

69 Fed.Reg. 70925, 70831–32 (Dec. 8, 2004) (emphasis added).

After considering the responses received, the Board has recently proposed adding an entirely new subsection to § 226.9 of Regulation Z [2]—proposed subsection g—which would specifically govern the timing and content of notice to the cardholder of an interest rate increase. Truth in Lending, 72 Fed.Reg. 32948, 33012–13, 33058 (proposed June 14, 2007) (to be codified at 12 C.F.R. § 226.9(g)). The proposed regulation would require notice to be provided after the cardholder's default, but at least forty-five days prior to the effective date of the interest rate increase. *Id.* at 33058. It would also inform the cardholder of the new higher interest rate, the date on which the higher interest rate will apply, and the balance to which

the higher rate will apply. *Id.* In its commentary to the proposed new rule, § 226.9(g), the staff explained—by reiterating the interpretation expressed in the 2004 ANPR—that the amendment is needed because under the current regulations, such notice is *not* required:

Advance notice currently is not required in all cases. For example, if an interest rate or other finance charge increases due to a consumer's default or delinquency, notice is required, but need not be given in advance. *See* current § 226.9(c)(1); comment 9(c)(1)–3. Furthermore, no change-in-terms notice is required if the specific change is set forth initially by the creditor in account-opening disclosures. *See* current comment 9(c)–1. *For example, some credit card account agreements permit the card issuer to increase the periodic rate if the consumer makes a late payment. Because the circumstances of the increase are specified in the advance in the account agreement, the creditor currently need not provide a change-in-terms notice; under current § 226.7(d) the new rate will appear on the periodic statement for the cycle in which the increase occurs.*

*Id.* at 33009 (emphasis added).

■ It is evident from these summaries that the staff to the Board regards the Chase practice complained of by Shaner—giving her the first notice of the rate increase in the periodic statement for the cycle—to be permitted under existing regulations. I accede to that interpretation and adopt it, even though, for the reasons set out above, it is not the only permissible

---

**2.** The Board has not yet taken final action on the proposed rules. On May 19, 2008 the Board sought additional comments on a limited number of additional revisions to Regulation Z and its Commentary. Truth in Lend-ing, 73 Fed.Reg. 28866 (proposed May 19, 2008) (to be codified at 12 C.F.R. pt. 226). The comment period for these additional revisions was to be open through July 18, 2008.

one. Under that interpretation, the complaint's first count, alleging a violation of TILA, fails to state a claim upon which relief can be granted.

Shaner's Chapter 93A claim is based on the putative violation of TILA. *See Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 175–76 (1st Cir.2004) (under Massachusetts state regulations, a violation of federal consumer protection statutes is a *per se* violation of 93A). Her Chapter 93A claim thus fails as the TILA claim fails.

■ Finally, Shaner claims that the retroactive assessment of interest as of the beginning of the billing period, though the default has occurred later than that, amounts to a "penalty" that is unlawful under the common law. Chase argues that the National Bank Act ("NBA") preempts this state cause of action and, in turn, that the practice does not violate the NBA.

Under the NBA, "[a]ny association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located." 12 U.S.C. § 85. Specifically, under § 85 a national bank can charge an interest rate in a foreign State higher than the laws of that State may permit, so long as if it is authorized to do so by the laws of the State in which it is located. *Marquette Nat'l Bank of Minn. v. First of Omaha Serv. Corp.*, 439 U.S. 299, 307, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). Chase is incorporated—and thus, "located"—in Delaware, and as long as Delaware law would allow the interest charged, it cannot be made unlawful, as a "penalty" or otherwise, by the law of another State. Shaner acknowledges as much, but argues that Delaware law does not authorize a change in the interest rate unless it is "in accordance with a schedule or formula" specified in the agreement, which she argues is absent in her case.

The relevant Delaware statute provides: If the agreement governing the revolving credit plan so provides, the periodic percentage rate or rates of interest under such plan may vary in accordance with a schedule or formula. Such periodic percentage rate or rates may vary from time to time as the rate determined in accordance with such schedule or formula varies and such periodic percentage rate or rates, as so varied, may be made applicable to all or any part of outstanding unpaid indebtedness under the plan on or after the first day of the billing cycle that contains the effective date of such variation including any such indebtedness arising out of purchases made or loans obtained prior to such variation in the periodic percentage rate or rates. Without limitation, a permissible schedule or formula hereunder may include provision in the agreement governing the plan for a change in the periodic percentage rate or rates of interest applicable to all or any part of outstanding unpaid indebtedness, whether by variation of the then applicable periodic percentage rate or rates of interest, variation of an index or margin or otherwise, contingent upon the happening of any event or circumstance specified in the plan, which event or circumstance may include the failure of the borrower to perform in accordance with the terms of the plan.

DEL.CODE ANN. tit. 5, § 944. This section expressly authorizes Chase's practice. First, § 944 permits Chase to impose a higher interest rate in the case of defaulting cardholders, and the higher interest rate may "be made applicable to all or any part of outstanding unpaid indebtedness under the plan on or after the first day of the billing cycle that contains the effective

date of such variation including any such indebtedness arising out of purchases made or loans obtained prior to such variation in the periodic percentage rate or rates." *Id.* Thus, there is no violation of Delaware law for any supposed "retroactive" interest rate increase.

Second, as to whether there is an "adequate schedule or formula," the express text of the Delaware statute again answers this question in Chase's favor. Section 944 provides that "a permissible schedule or formula hereunder may include provision in the agreement governing the plan for a change in the periodic percentage rate or rates of interest applicable to all or any part of outstanding unpaid indebtedness ... contingent upon the happening of any event or circumstance specified in the plan, which event or circumstance may include the failure of the borrower to perform in accordance with the terms of the plan." *Id.* The Cardmember Agreement does exactly that; it expressly permits a change in the interest rate in the event of "the failure of the borrower to perform in accordance with the terms of the plan," *i.e.,* default. (2004 Change–in–Terms Notice 5); *see also Evans,* 2006 WL 213740, at *3 n. 6 ("The statute declares that a permissible formula or schedule can be based on the occurrence or non-occurrence of an event or circumstance described in the agreement, such as we see in the Cardmember Agreement."); *McCoy,* Order at 7 (adopting the *Evans'* court's analysis); *Lowman v. MBNA Am. Bank, N.A.,* No. 05–75001 ER, at 2 (C.D.Cal. Feb. 17, 2006) (order granting in part and denying in part MBNA's motion to dismiss) ("Delaware law provides no relief for allegedly unconscionable interest rates that are specifically authorized by the Delaware Banking Act."); *Penner,* 2006 WL 2192435, at *4 (finding that the Cardmember Agreement "complied with" the statutory requirements of § 944).

Since the practice is lawful in the State where Chase is located, the NBA prevents it from being made unlawful in any other State. The common law "penalty" claim fails as well.

For all the foregoing reasons, the defendant's motion to dismiss (dkt. no. 18) is GRANTED in its entirety. The action is DISMISSED.

It is SO ORDERED.