**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES A. MCCOY, on behalf of
himself and all others similarly
situated,
           *Plaintiff-Appellant,*

v.

CHASE MANHATTAN BANK, USA,
National Association,
           *Defendant-Appellee.*

No. 06-56278

D.C. No.
CV-06-00107-JVS

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
November 21, 2008—Pasadena, California

Filed March 16, 2009

Before: Richard D. Cudahy,* Harry Pregerson, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Hawkins;
Dissent by Judge Cudahy

---

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

3325

**COUNSEL**

Barry L. Kramer (authored briefs and presented argument), Law Offices of Barry L. Kramer, Los Angeles, California, for the plaintiff-appellant.

Robert S. Stern (authored brief) and Nancy R. Thomas (presented argument), Morrison & Foerster, LLP, Los Angeles, California, for the defendant-appellee.

**OPINION**

HAWKINS, Circuit Judge:

This case presents the question of whether the notice requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1615 and Regulation Z, 12 C.F.R. § 226, as interpreted by the Federal Reserve Board's Official Staff Commentary, apply to discretionary interest rate increases that occur because of consumer default. We hold that Regulation Z requires a creditor to provide contemporaneous notice of such rate increases.

## FACTUAL AND PROCEDURAL BACKGROUND

James A. McCoy ("McCoy") brought this action on behalf of himself and others similarly situated against Chase Manhattan Bank, USA, N.A. ("Chase"), a national bank located in Delaware. McCoy alleges that Chase increased his interest rates retroactively to the beginning of his payment cycle after his account was closed to new transactions as a result of a late payment to Chase or another creditor. McCoy claims that the rate increase violated TILA and Delaware law because Chase gave no notice of the increase until the following periodic statement, after it had already taken effect. The district court dismissed McCoy's complaint with prejudice, holding that because Chase discloses the highest rate that could apply due to McCoy's default in its cardmember agreement with McCoy ("Cardmember Agreement"), no notice was required.

## JURISDICTION AND STANDARD OF REVIEW

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and review dismissals for failure to state a claim de novo. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

**DISCUSSION**

*Federal TILA Claim*

**[1]** Congress enacted TILA to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Regulation Z, adopted by the Federal Reserve Board to implement TILA, addresses when and how notice of changes in terms must be given:

> Written notice required. Whenever any term required to be disclosed under § 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed or delivered at least 15 days prior to the effective date of the change. The 15-day timing requirement does not apply if the change has been agreed to by the consumer, or if a periodic rate or other finance charge is increased because of the consumer's delinquency or default; the notice shall be given, however, before the effective date of the change.

12 C.F.R. § 226.9(c)(1). Section 226.6 requires that a creditor disclose *inter alia* "each periodic rate that may be used to compute the finance charge." 12 C.F.R. § 226.9(a)(2).

The parties dispute the meaning of the phrase "any term required to be disclosed under § 226.6." Chase argues that the phrase applies only to the contractual terms of Chase's Cardmember Agreement. McCoy suggests the phrase also applies to the list of specific "items" § 226.6(a)(2) requires be disclosed, which includes the interest rate that may be used.

Although we find McCoy's interpretation more natural, we acknowledge that the text of Regulation Z is ambiguous.

We defer to an agency interpretation of its own ambiguous regulation provided it is not "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). We do not "permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000).

Chase argues that the Federal Reserve Board ("FRB")'s Official Staff Commentary interprets Regulation Z to require no notice in this case. We disagree.

**[2]** Comment 3 is the most salient Official Staff Commentary to § 226.9(c)(1) and, when describing the amount of notice required for different kinds of changes, provides that "a notice of change in terms is required, but may be mailed or delivered as late as the effective date of the change . . . [i]f there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default." § 226.9(c)(1), cmt. 3. The plain-meaning of Comment 3 is to require notice when a cardholder's interest rates increase because of a default, but to specify that the notice may be contemporaneous, rather than fifteen days in advance of the change. Under Comment 3, McCoy has stated a claim.

Chase argues that because Comment 3 repeats language from Regulation Z, a different portion of the Official Staff Commentary, Comment 1, should govern instead. Comment 3's specific reference to interest rate increases attributable to the consumer's delinquency or default is directly on point and therefore governs. Even if we decided that Comment 1, despite preceding Comment 3, could somehow be interpreted as an exception to it, we would still hold that Comment 1 does

not dispel Chase's obligation to notify its account holders of discretionary rate increases.

**[3]** Comment 1 to § 226.9(c)(1) describes the circumstances in which Regulation Z requires no notice of a change in terms:

> "Changes" initially disclosed. *No notice of a change in terms need be given if the specific change is set forth initially*, such as: Rate increases under a properly disclosed variable-rate plan, a rate increase that occurs when an employee has been under a preferential rate agreement and terminates employment, or an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum. In contrast, *notice must be given if the contract allows the creditor to increase the rate at its discretion but does not include specific terms for an increase* (for example, when an increase may occur under the creditor's contract reservation right to increase the periodic rate).

12 C.F.R. § 226.9(c), cmt. 1 (emphasis added).

The effect of Comment 1, assuming arguendo it applies, depends on how the phrase "specific" is defined. McCoy argues that the "specific change is set forth initially" and the "specific terms for an increase" are included in a contract when the contract gives consumers the information they need in order to know what interest rate they will be charged and under what conditions. Chase argues that any agreement that specifies the *possibility* of an interest rate increase if the cardholder defaults and establishes any boundaries on the potential amount of the increase adequately "sets forth" a "specific change."

**[4]** McCoy's reading of Comment 1's use of the word "specific" is reinforced by the three examples Comment 1 includes of rate increases for which notice is *not* required. The first example is "rate increases under a properly disclosed variable-rate plan." *Id.* Variable rate plans specify that the interest rate will fluctuate in direct correspondence with an externally determined variable rate such as, for example, the Federal Prime rate. Providing additional notice of the interest rate charged under a variable rate plan would be redundant because variations in the interest rate are not discretionary, and the method for computing the interest rate based on the Federal Prime rate is fully specified in advance. Creditors in that circumstance need not provide additional notice because consumers can predict their precise interest rate according to a formula.

The second example in Comment 1 is "a rate increase that occurs when an employee has been under a preferential rate agreement and terminates employment." *Id.* Again, the notice of such a rate increase would be redundant because it "occurs" whenever the employee terminates employment. Nothing suggests the creditor possesses any discretion over whether to increase the rates or by how much to do so once the event triggering a higher rate occurs.

The third example is "an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum." *Id.* Again, the use of the word "occurs" rather than the phrase "may occur" suggests that additional notice would be redundant because the increase is non-discretionary.[1] All three

---

[1]Although the dissent argues for an alternative view of these examples, we do not believe it is reading too much into the Board's description of "an increase that occurs" when specified criteria are met to conclude that the phrase refers to automatic increases. By declining to read the word "may" into the Board's language, we choose the more natural reading of the examples, if not the only conceivable one.

examples pertain to rate increases that are spelled out in card-member agreements and ascertainable by the consumer without additional notice.

In contrast to these examples, the increase here occurs at Chase's discretion and the most pertinent "specific terms for an increase" — the actual amount of the increase and whether it will occur — are not disclosed in advance. The Cardmember Agreement states that Chase "may" change McCoy's interest rate and impose a non-preferred rate "up to" the maximum rate described in the pricing schedule. The agreement further states that McCoy's account "may" lose its preferred rates if he defaults. Although the agreement defines what constitutes a "default" triggering Chase's ability to exercise this discretion, a default is only one of the conditions required for an increase; it may be necessary, but apparently it is not sufficient. Chase outlines several other criteria it "may" obtain and use to review McCoy's account "for the purposes of determining its eligibility for Preferred rates," including McCoy's consumer credit reports, his payment history and level of utilization over the life of his account, and his other relationships with Chase and its affiliates.

Chase does not disclose to McCoy how it may use this information and provides McCoy with no basis for predicting in advance what retroactive interest rate Chase will choose to charge him if he defaults. Under the agreement, when McCoy defaults, he will not know whether his rate will stay the same, increase slightly, or rise to the maximum default rate until he receives his next periodic statement listing the new rate. Worse yet, this new rate would then apply retroactively.

Chase argues that the terms for an increase are adequately specified because the concept of a "default" is defined and because consumers are aware of the maximum rate they might pay in the "worst case scenario." It further argues that the discretionary increase that may occur when a consumer defaults can be reconceptualized as an automatic increase, followed by

a discretionary reduction in rates. The district court accepted this line of reasoning, concluding that a "decision not to increase a rate is analytically indistinct from a decision to lower a rate."

[5] This argument proves too much because it would apply equally to Comment 1's example of when contemporaneous notice *is* required. Comment 1 specifically explains that notice must be given "when an increase may occur under the creditor's contract reservation right to increase the periodic rate." 12 C.F.R. § 226.9(c), cmt. 1. Like a "reservation right to increase the periodic rate," the contract provision authorizing Chase to increase a defaulted consumer's interest rate up to the maximum default rate at its discretion does not give the cardholder sufficient information to know what rate will apply and therefore requires the creditor to provide notice. Chase's "contract allows the creditor to increase the rate at its discretion," § 226.9(c), cmt. 1, and does not specify the relevant terms, including the conditions that are necessary and sufficient for an increase to occur and the actual amount of the increase that will occur. Chase's agreement not to increase the interest rate higher than a preset, double-digit maximum does not materially distinguish its Cardmember Agreement from a contract reservation right to increase the periodic rate. An interpretation of Comment 1 as eliminating Regulation Z's notice requirement even where consumers do not have sufficient information to determine whether their interest rate will be raised, or by how much, dilutes the meaning of the word "specific" beyond recognition.

[6] Chase argues that we must nevertheless interpret Regulation Z to require no notice in this case because we must defer to a now-superceded Advance Notice of Proposed Rulemaking,[2] promulgated for public comment by the Federal

---

[2]This 2007 ANPR has been superceded by a final rule amending Regulation Z to require forty-five days' notice for rate increases effective July 1, 2010. Truth in Lending, 74 Fed. Reg. 5244 (Jan. 29, 2009) (to be codified at 12 C.F.R. § 226.9(g)(1)).

Reserve in 2007, which briefly characterizes existing law in the process of explaining a proposal to amend Regulation Z to increase the amount of notice for interest rate increases to forty-five days in most cases. Truth in Lending, 72 Fed. Reg. 32948-01, 33009 (proposed June 14, 2007) ("2007 ANPR").

Consideration of the 2007 ANPR does not lead us to change our interpretation of the FRB's Official Staff Commentary. Chase observes that the 2007 ANPR includes as an example of when a "change-in-terms notice" is not required, "some credit card account agreements [that] permit the card issuer to increase the periodic rate if the consumer makes a late payment," noting that "[b]ecause the circumstances of the increase are specified in advance in the account agreement, the creditor currently need not provide a change-in-terms notice; under current § 226.7(d) the new rate will appear on the periodic statement for the cycle in which the increase occurs." 72 Fed. Reg. 33009. The effect of this language is ambiguous, however, because the term "change-in-terms notice" could, as Chase argues, refer to contemporaneous notice required for changes in interest rates, but might instead refer only to the fifteen days' advance notice required for changes in contractual terms.[3]

The 2007 ANPR also contains language suggesting it "is currently the case" that notice *is* required even if "the creditor specifies the penalty rate and the specific events that may trigger the penalty rate in the account-opening disclosures." 72 Fed. Reg. 33012. The FRB reaffirmed this view in the "Supplementary Information" published by the FRB along with the final rule amending Regulation Z. In any case, FRB chose to

---

[3]A slightly less terse, but substantively identical, provision in a 2004 ANPR suggests that the latter is more likely, stating that where the circumstances of an increase are specified in advance, "the creditor need not provide a change-in-terms notice *15 days in advance* of the increase; the new rate will appear on the periodic statement for the cycle in which the increase occurs." Truth in Lending, 69 Fed. Reg. 70925-01, 70931-32 (proposed Dec. 8, 2004) (emphasis added).

remove the ambiguous language entirely when it issued a Final Rule and Supplementary Information amending Regulation Z in 2009. Truth in Lending, 74 Fed. Reg. 5244, 5350-03 (Jan. 29, 2009). Both the older ANPR and the recently approved statement of the FRB's views clearly state it "is currently the case" under Comments 1 and 3 that contemporaneous notice of default-based rate increases is required even where the "creditor specifies the penalty rate and the specific events that may trigger the penalty rate in the account-opening disclosures." *Id.*

**[7]** Therefore, while language scattered throughout the 2007 ANPR offers some support for each view of the Official Commentary, the ANPR does not clearly weigh in favor of either interpretation of Regulation Z. This ambiguity is not surprising because the primary purpose of the 2007 ANPR (and the 2004 ANPR that preceded it) was to announce proposed amendments to Regulation Z and solicit comment, not to offer additional staff commentary on Regulation Z's current requirements.

As the dissent notes, although no binding authority has addressed this question,[4] several district court opinions and one unpublished memorandum disposition in this circuit have accepted Chase's view. *See, e.g.*, *Evans v. Chase Bank USA, N.A.*, 267 Fed. Appx. 692, 693 (9th Cir. 2008) (unpublished disposition); *Swanson v. Bank of America, 566 F. Supp. 2d*

---

[4]This case is not governed by *Hauk v. JP Morgan Chase Bank United States*, 552 F.3d 1114 (9th Cir. 2009), which interpreted 12 C.F.R. § 226.6(a) to allow a promotional interest rate to be discontinued due to a late payment made prior to undertaking a balance transfer agreement. The plaintiff in *Hauk* did not appear to allege that the interest rate increase violated TILA because it was a discretionary interest rate increase undertaken without contemporaneous notice. Consequently, *Hauk* rested its holding on the irrelevance under TILA of a creditor's "undisclosed intent to act inconsistent with its disclosures," *id.* at *18, and did not address whether § 226.9, as interpreted by Comment 1 or Comment 3, requires contemporaneous notice for such increases.

*821 (N. D. Ill. 2008); Williams v. Wash. Mut. Bank*, 2008 U.S. Dist. LEXIS 5325 (E.D. Cal. Jan. 10, 2008)*; Shaner v. Chase Bank, USA, N.A.*, 570 F. Supp. 2d 195, 200 (D. Mass. 2008); *Evans v. Chase Manhattan Bank USA, N.A.*, 2006 U.S. Dist. LEXIS 5259 (N.D. Cal. Jan. 27, 2006). Most of these decisions cite the district court's analysis in *Evans*, which held that Chase set out the "specific terms for an increase" because "Chase gives the reasons for its rate changes." *Evans*, 2006 U.S. Dist. LEXIS 5259, at *7-8. In *Evans*, the district court apparently labored under the misconception that Comment 3 precedes Comment 1 and therefore did not apply where the conditions specified in Comment 1 are met. *See id.*, at *6 (citing Comment 3 and then asserting that "[t]he Commentary goes on to state, however, that '[n]o notice of a change in terms need be given if the specific change is set forth initially,' ") (quoting Comment 1). Possibly for the same reason, most of these courts did not even discuss Comment 3 and none attended to the 2007 ANPR's internal ambiguities or considered what kind of deference, if any, is owed to an agency's characterizations of existing law when they are incidental to the purpose of an agency publication.[5] Our own consider-

---

[5]The relevance of the 2007 ANPR was limited even before it was superceded because we defer to the FRB's Official Staff Commentary, not incidental descriptions of current law contained in an ANPR. The FRB has prescribed the Official Staff Commentary as "the vehicle by which the staff of the [FRB] issues official staff interpretations of Regulation Z." 12 C.F.R. Part 226, Supp. I, para. 1; *see also Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 568 (1980) (distinguishing the deference owed to Board and official staff interpretations from that owed to unofficial interpretations). Although Chase may, at a later stage of litigation, assert a statutory "good-faith" defense under 15 U.S.C. § 1640(f) for acting in conformity with an FRB interpretation promulgated "under such procedures as the Board may prescribe," the defense is only available for actions based on the Official Staff Commentary, not on such incidental interpretations appearing in an ANPR, particularly one that was promulgated after this suit was filed and could not have been relied upon when Chase acted.

*Auer*, 519 U.S. at 462, would not require any greater showing of deference. In *Auer*, the court deferred to an interpretation of a rule contained

ation of the FRB's Official Staff Commentary, unofficial ANPRs, and the Supplementary Information accompanying its recent amendment of Regulation Z leaves us firmly convinced of the FRB's intent to require contemporaneous notice when rates are raised because of a consumer's delinquency or default, as McCoy alleges occurred in this case.

*State Law Claims*

In his second, third, and fourth causes of action, McCoy claims that Chase's practice of retroactively raising interest rates after a consumer defaults is unconscionable and that he is therefore entitled to declaratory relief, reformation, and damages for imposing an illegal penalty. The district court correctly noted that these causes of action are foreclosed *if* Delaware law specifically authorizes the practice because, pursuant to the National Bank Act, 12 U.S.C. § 85, Delaware law governs what interest Chase may charge and the methodology used to determine that interest rate.

**[8]** We reverse the dismissal of these claims, however, because the Delaware Banking Act authorizes rates of interest that "vary in accordance with a schedule or formula." 5 Del. C. § 944. As the district court noted, a permissible schedule or formula may include a provision for a change in the "rates

---

in an agency's legal brief that was directed specifically to the "matter in question." *Id.* at 462; *see also Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 213, 217 (1981) (characterizing a proposed ruling merely as "persuasive authority" not "wholly without significance," even though it was directly on the matter in question).

Here, the 2007 ANPR's tersely worded "interpretations" of existing law are incidental to the purpose of the agency action, are stated in conclusory fashion, are themselves ambiguous, and have now been superceded. Therefore, unlike in *Auer*, we do have "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462. Consequently, we interpret the FRB's Official Staff Commentary directly.

of interest applicable to all or any part of outstanding unpaid indebtedness . . . contingent upon the happening of any event or circumstance specified in the plan," including a default. *Id.* Section 944 therefore would clearly authorize a "schedule or formula" that specified a higher interest rate that would automatically apply in the event of default. However, the language of § 944 does not appear to authorize rate increases that are discretionary and vary according to criteria in addition to the consumer's default where those criteria are not specified in a schedule or formula contained in the agreement.

Absent binding Delaware court decisions construing the terms "schedule," "formula," or "contingent upon" in § 944, our task is to "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Arizona Elec. Power Coop., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995) (quoting *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990)). In this case, however, only federal district courts have construed § 944 and not one has adequately addressed the importance of the discretionary nature of the increases or whether such increases are really "in accordance with a schedule or formula." *See, e.g.*, *Swanson v. Bank of Am., N.A.*, 566 F. Supp. 2d 821, 829 (N.D. Ill. 2008) ("By describing the events which cause the rate increase to occur, Defendant has complied with Section 944."); *Evans v. Chase Manhattan Bank USA*, N.A., 2006 U.S. Dist. LEXIS 5259, at *12 (N.D. Cal. Jan. 27, 2006) (concluding an agreement complied with § 944 because it described "what events will cause default rates to go into effect").

**[9]** These interpretations of § 944 neglect to consider fully whether rate increases truly are "contingent upon" a default and in "accordance with a schedule or formula" where they are discretionary and can result in a range of interest rates depending on undisclosed criteria beyond the occurrence of a default. A close analysis of the Cardmember Agreement

reveals that it does not describe the specific events that "*will* cause default rates to go into effect," *Evans*, 2006 U.S. Dist. LEXIS 5259, at *12 (emphasis added), but only those that *may* do so. It also fails to disclose how much Chase will actually increase rates should it choose to do so. As a result, we hold that the rate increases McCoy faced under the Cardmember Agreement were not authorized by § 944 because no "schedule or formula" contained in the agreement revealed whether the increases would occur or how large they would actually be.

**[10]** Having held that the contract provision authorizing discretionary interest rate increases is not authorized by § 944, we conclude that McCoy has made out a colorable claim that the provision may also be "unconscionable" under Delaware law and he should "be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making its determination." 6 Del. C. § 2-302; *see also Evans*, 2006 U.S. Dist. LEXIS 5259, at *12 (noting that absent authorization under § 944, "Plaintiffs' unconscionability contention may have had some weight").

Any increased interest charge stemming from a default that occurs retroactively functions as "damages paid in the event of a breach," not compensation for the increased risk of non-collection, because McCoy would still owe that retroactively imposed additional charge even if he paid Chase his entire balance the moment after he defaulted. For these reasons, we reverse the dismissal of McCoy's second, third, and fourth causes of action.

**[11]** McCoy's fifth cause of action alleges Chase committed consumer fraud by failing to provide notice of an increase in interest. Delaware's consumer fraud statute, 6 Del. C. § 2513(a), prohibits:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, mis-

representation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

This allegation fails to state a claim for consumer fraud under § 2513(a) because Chase openly and expressly notifies cardholders of the actions it reserves the right to take in the event of a default. Although Chase may have failed to fulfill its obligations under federal and Delaware law, McCoy has not alleged facts to support a finding that it concealed or misrepresented the possibility that it might raise rates without notice when a consumer defaulted. We affirm the dismissal of McCoy's fifth claim for relief.

[12] McCoy's sixth and seventh causes of action allege claims for breach of contract and tortious breach of the implied covenant of good faith and fair dealing. The Cardmember Agreement states that Chase would "notify [McCoy] of any change if required by applicable law." Given the requirements under TILA and Delaware law discussed above, while McCoy clearly has stated a claim that Chase breached this explicit contractual provision,[6] he cannot state an implied duty of good faith claim because "where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23

---

[6]Chase's citation to the pre-existing legal duty doctrine is inapposite because a contractual promise to comply with preexisting federal legal obligation is enforceable, *Island Ins. Co. v. Hawaiian Foliage & Landscape, Inc.*, 288 F.3d 1161, 1167 (9th Cir. 2002), provided the contract is supported by independent consideration, *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 21 (Del. 2001).

(Del. Ch. 1992). Consequently, we reverse the dismissal of the sixth cause of action and affirm the dismissal of the seventh.

## CONCLUSION

Under Regulation Z as interpreted by its Official Staff Commentary, McCoy has stated a TILA claim if Chase failed to give him notice of an interest rate increase "because of the consumer's delinquency or default" or if his contract with Chase "allows the creditor to increase the rate at its discretion but does not include the specific terms for an increase." 12 C.F.R. § 226.9(c)(1); *Id.*, cmt. 3; *Id.*, cmt. 1. Having concluded that McCoy has stated a claim under either standard, we reverse and remand to the district court. We affirm the dismissal of McCoy's fifth and seventh causes of action, but reverse the dismissal of McCoy's other state law claims.

**AFFIRMED IN PART AND REVERSED IN PART.** Costs on appeal to Appellant.

---

CUDAHY, Circuit Judge, dissenting:

Before addressing the myriad arguments made by the majority, I think it would be helpful to put matters in context — view the "big picture." The claims made by Mr. McCoy have been raised in many other forums, usually by the same attorneys who represent him here. *See Evans v. Chase Bank USA, N.A.*, 267 Fed. Appx. 692 (9th Cir. Feb. 22, 2008); *Swanson v. Bank of Am.*, 566 F. Supp. 2d 821 (N.D. Ill. 2008); *Williams v. Wash. Mut. Bank*, 2008 WL 115097 (E.D. Cal. Jan. 11, 2008); *Augustine v. FIA Card Servs., N.A.*, 485 F. Supp. 2d 1172 (E.D. Cal. 2007); *Penner v. Chase Bank USA, N.A.*, 2006 WL 2192435 (W.D. Wash. Aug. 1, 2006); *Evans v. Chase Manhattan Bank USA, N.A.*, 2006 WL 213740 (N.D. Cal. Jan. 27, 2006). In all of those cases the result was

the opposite of the one reached here. In one case the court did at first indicate that it was inclined to rule in favor of the plaintiffs but reversed course when it was made aware of the Advance Notice of Proposed Rulemaking (ANPR) issued by the expert agency, the Federal Reserve Board (FRB or the Board), which quite clearly showed that the Board disagreed with their interpretation. *Shaner v. Chase Bank USA, N.A.*, 570 F. Supp. 2d 195, 199-200 (D. Mass. 2008) (citing 69 Fed. Reg. 70925-01, 70931-32 (Dec. 8, 2004)). The majority concedes, as it must given the unanimity of results on the other side, that the regulation is ambiguous. But the majority then departs from those holdings, and from established Supreme Court precedent, by refusing to defer to the Board's interpretation in the face of that ambiguity, and by suggesting, somewhat misleadingly, that the Board's interpretation is less than clear.

The provision of Regulation Z at issue here provides that "Whenever any *term* required to be disclosed under § 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected." 12 C.F.R. § 226.9(c)(1) (emphasis added). This refers back to Section 226.6(a)(2), which says, "[t]he creditor shall disclose to the consumer . . . each of the following *items*, to the extent applicable: . . . each periodic rate that may be used to compute the finance charge . . . and the corresponding annual percentage rate." 12 C.F.R. § 226.6(a)(2) (emphasis added). So the question becomes the following: did Section 226.9(c)(1) require Chase to provide contemporaneous notice to McCoy of an increase in his interest rate due to his default when that increase was an implementation of the existing terms of his agreement with Chase?[1] The majority says that although the

---

[1]The relevant portions of McCoy's Cardmember Agreement were the following:

**CHANGE IN TERMS NOTICE**

regulation is ambiguous, the FRB's Official Staff Commentary to § 226.9(c)(1) makes the answer a clear "yes." The

---

We are making certain changes to the terms of your Account as described below. . . .

The following are changes to the existing terms of your Account.

- **Preferred Customer Pricing Eligibility . . . .** The section will be revised to read as follows:

  **Preferred Customer Pricing Eligibility . . . .** Your Account will be reviewed every month on your Statement Closing Date to determine its continued eligibility for the Preferred or Non-Preferred rates. On each monthly review, we may change your interest rate and impose a Non-Preferred rate up to the maximum Non-Preferred rate described in the Pricing Schedule for each occurrence when you do not meet the conditions described below to be eligible for Preferred [rates]. Any changes in pricing as a result of the monthly reviews for Preferred or Non-Preferred rates will apply to existing as well as new balances and will be effective with the billing cycle ending on the review date.

  To keep Preferred rates, the following conditions must be met as of the review date:

  *you have made at least the required minimum payments when due on your Account and on all other loans or accounts with us and your other creditors; and

  *the credit limit on your Account has not been exceeded; and

  *any payment on your Account has not been returned unpaid.

  If you do not meet all of these conditions . . . your Account may lose its Preferred rates. . . .

  We may obtain consumer reports from credit bureaus on you at any time in the future. We may use the reports and their contents, as well as information about your Account including its payment history and level of utilization over the life of your Account, and your other relationships with us and our affiliates to review your Account including for the purposes of determining its eligibility for Preferred rates and of establishing the Non-Preferred rate that may apply to your Account.

Appellant's Excerpts of Record, Tab 14, at Chase 00026.

majority feels no need to give any deference to the Board's views expressed in its ANPRs, which lead to the opposite conclusion and which are reinforced by every other court that has considered the question. *See supra.*

The Supreme Court has instructed us to give respect and deference to the Board when interpreting the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565-69 (1980) ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive. . . ."); *see also Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 212-13, 217 (1981). I would find that the Supreme Court requires deference to Board interpretations found in ANPRs. This required deference, of course, reflects universally applicable Supreme Court jurisprudence in keying statutory and regulatory interpretation on deference to the views of the responsible executive agencies. *See, e.g.*, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).

On December 19, 2008, as the majority notes, the Board issued a final rule amending Section 226.9 to require 45 days' notice for rate increases because of defaults, irrespective of whether the possibility of those increases was disclosed in a cardmember agreement. This new rule becomes effective in 2010. Truth in Lending, 74 Fed. Reg. 5244-01 (Jan. 29, 2009) (to be codified at 12 C.F.R. pt. 226). It comes after at least two ANPRs, 69 Fed. Reg. 70925-01, 70931-32 (Dec. 8, 2004); 72 Fed. Reg. 32948-01, 33009 (June 14, 2007), both of which recognized that requiring additional notice in these circumstances is a change from what is currently required. The 2007 ANPR explains:

> Advance notice is not required in all cases. For example, if an interest rate or other finance charge increases due to a consumer's default or delinquency, notice is required, but need not be given in

advance. See current § 226.9(c)(1); comment 9(c)(1)-3. Furthermore, no change-in-terms notice is required if the specific change is set forth initially by the creditor in the account-opening disclosures. See current comment 9(c)-1. *For example, some account agreements permit the card issuer to increase the periodic rate if the consumer makes a late payment. Because the circumstances of the increase are specified in advance in the account agreement, the creditor currently need not provide a change-in-terms notice*; under current § 226.7(d) the new rate will appear on the periodic statement for the cycle in which the increase occurs.

72 Fed. Reg. 33009 (emphasis added).[2]

The majority says that the relevance of the Board's statements is limited and we need not defer to them because they are not official comments, but merely "incidental descriptions of current law contained in an ANPR." Despite the majority's assertion to the contrary, its position conflicts starkly with that of the Supreme Court, which in *Anderson Bros. Ford* gave significant weight to a nearly identical publication. *See id.*, 452 U.S. at 212-13, 217 (calling a proposed official staff interpretation "persuasive authority" and concluding that "we cannot agree that the staff's views expressed in the proposed

---

[2]The distinction between "change-in-terms" notice and "advance notice" suggested by McCoy in his reply and by the majority is a weak attempt to escape the direct and explicit statements by the Board that contradict their position. Additionally, I disagree with the majority's interpretation of the Board's statement in its December 2008 "Supplementary Information" regarding what is "currently the case" as recognizing that contemporaneous notice is currently required by existing law. A near-verbatim statement appeared in the 2007 ANPR. 72 Fed. Reg. 33012. Elsewhere in that ANPR, as has already been discussed, the Board explicitly rejected the majority's view that Official Staff Commentary requires contemporaneous notice in a case like this one. I would not interpret a repetition of any portion of the 2007 ANPR as a sudden change of the Board's opinion.

ruling are wholly without significance"). In *Anderson Bros. Ford*, the Board published for comment an Official Staff Interpretation that was directly contrary to the view taken by three out of four courts of appeals. The Board said that while a "technical reading" of Regulation Z might support the three courts of appeals, it was the Board's opinion that the disclosure was not the type of thing "meant to be" required by Regulation Z (and was therefore not in fact required). *Id.* at 212-13. The Court said that the Board's interpretation did not conclusively establish the meaning of the words used in TILA, but that "absent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation." *Id.* at 219. The Court strongly implied that this was so even if the text of the provision at issue suggested a contrary result, saying,

> Unaided by an administrative construction of the TILA and Regulation Z, a court could easily conclude, based on the language of the statute and of Regulation Z, that the interest in unearned insurance premiums acquired by the creditor in this case should be characterized as a "security interest" that must be disclosed. *But, in light of the proposed official staff interpretation of Regulation Z* [and the legislative history of TILA and related statutes], it is evident that the Board [disagrees].

*Id.* at 222 (emphasis added). The Court noted that it "has frequently relied on the principle that 'a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' " *Id.* at 222 n.20.[3]

---

[3]*Cf. Milhollin*, 444 U.S. at 560 ("At the threshold . . . interpretation of TILA and Regulation Z demands an examination of their express language; absent a clear expression, it becomes necessary to consider the implicit character of the statutory scheme. For the reasons following, we conclude that the issue [here] is not governed by clear expression in the statute or regulation, and that it is appropriate to defer to the Federal Reserve Board and staff in determining what resolution of that issue is implied by the truth-in-lending enactments.").

An ANPR does not meaningfully differ from a "proposed official staff interpretation" for purposes of the deference we ought to accord it. The Supreme Court's decision in *Milhollin*, 444 U.S. 555, also supports this view. Although, as the majority points out, *Milhollin* distinguishes between "official" and "unofficial" staff interpretations in specifying which of the FRB's views may be relied on for a good-faith defense under 15 U.S.C. § 1640(f), *Milhollin*'s description of what makes an official interpretation "official" would apply equally to an ANPR: "[o]fficial interpretations are published in the Federal Register, and opportunity for public comment may be requested." *Milhollin*, 444 U.S. at 567 n.10. The same is true of ANPRs. *See* 72 Fed. Reg. 32948 ("The proposed revisions take into consideration comments from the public on an initial advance notice of proposed rulemaking (ANPR) published in December 2004 on a variety of issues relating to the format and content of open-end credit disclosures and the substantive protections provided under the regulation."). Moreover, the Court in *Milhollin* did not restrict itself to consideration of "official interpretations." It also considered FRB Public Information Letters and CCH Consumer Credit Guides in divining the agency's views on the matter in question. *See Milhollin*, 444 U.S. at 563 & n.8. Nothing in *Milhollin* suggests that similar deference would not be appropriate here. To the contrary, *Milhollin* emphasized that the "traditional acquiescence in administrative expertise is particularly apt under TILA, because the Federal Reserve Board has played a pivotal role in 'setting [the statutory] machinery in motion.' " 444 U.S. at 566 (quoting *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315 (1933)). In short, *Milhollin* encourages more deference, not less, to the Board's stated views.

The majority also marshals *Auer v. Robbins*, 519 U.S. 452 (1997) in support of its argument that ANPRs deserve no deference, but *Auer*, too, cuts the other way. *Auer* accords "controlling" deference to an agency interpretation found in a legal brief. 519 U.S. at 461, 462. Briefs drafted in litigation necessarily carry less weight than proposed rules subject to notice

and comment, yet the *Auer* Court deferred because there was "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Id.* at 462. *See also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 417-18 (1945) ("Any doubts concerning this interpretation of [the regulation] are removed by reference to the administrative construction of [the rule]," including in bulletins issued with the regulation, the Administrator's First Quarterly Report to Congress, and the Administrator's statement that this position had uniformly been taken "in countless explanations and interpretations" given to those affected by the regulation.).

It follows that, even if we somehow owe less deference to statements of the Board contained in an ANPR than we would to an official comment, that does not mean we owe no deference at all, or less than controlling deference in the present case. *See United States Freightways Corp. v. C.I.R.*, 270 F.3d 1137, 1141 (7th Cir. 2001) ("[D]eference to agency positions is not an all-or-nothing proposition; more informal agency statements and positions receive a more flexible respect . . ."). As a practical matter, the Board has made its opinion regarding the correct interpretation of its own regulation more than clear, and for the various reasons explained by the Supreme Court on many occasions, *see, e.g.*, *Milhollin*, 444 U.S. at 565-69, we owe that opinion deference. Therefore, it is abundantly clear that the Supreme Court would not countenance disregard for the Board's opinion regarding the correct interpretation of Regulation Z, even if that opinion appears in an ANPR rather than Official Staff Commentary.

The majority, however, provides its own analysis based on its own interpretation of the FRB's Official Staff Commentary regarding Regulation Z, brushing aside the Board's views found in ANPRs. The potentially relevant comments are Comment 1 to Section 226.9(c) and Comment 3 to Section 226.9(c)(1):

### 9(c) Change in Terms

1. *Changes* initially disclosed. No notice of a change in terms need be given if the specific change is set forth initially, such as: Rate increases under a properly disclosed variable-rate plan, a rate increase that occurs when an employee has been under a preferential rate agreement and terminates employment, or an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum. In contrast, notice must be given if the contract allows the creditor to increase the rate at its discretion but does not include specific terms for an increase (for example, when an increase may occur under the creditor's contract reservation right to increase the periodic rate). . . .

. . .

### 9(c)(1) Written Notice Required

3. *Timing-advance notice not required.* Advance notice of 15 days is not necessary — that is, a notice of change in terms is required, but it may be mailed or delivered as late as the effective date of the change — in two circumstances:

- If there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default . . . .

12 C.F.R. § 226.9(c), cmt. 1; 12 C.F.R. § 226.9(c)(1), cmt. 3.

The majority concludes that "Comment 3's specific reference to interest rate increases attributable to the consumer's delinquency or default is directly on point and therefore gov-

erns." But these two comments are not a case of the specific versus the general or of one being an exception to the other. Instead, they are independent and each governs a distinct issue: Comment 1, whether a change-in-terms notice is required, and Comment 3, in cases where a change-in-terms notice is required, whether it must be issued 15 days in advance or not. Comment 3 does not purport to govern the question whether notice is required. Neither does it specifically govern default situations.[4] Instead, it is entitled "Timing," and it specifically governs timing issues. In contrast, as the majority generally recognizes, "Comment 1 . . . describes the circumstances in which Regulation Z requires no notice of a change in terms." *Accord Swanson*, 566 F. Supp. 2d at 827 ("Comment 3 applies only to the timing of a notice of 'change of terms.' As discussed above, Defendants' practice at issue here does not involve a 'change of terms' as contemplated by Section 226.9(c)(1).").[5] The majority does not recognize this distinction and therefore fails to account for the fact that, because Comment 3 assumes situations where notice is required and controls only timing, it does not address the question at issue here.

The majority says that even if Comment 1 applies, Chase did not satisfy its requirements and Comment 1 does not excuse Chase from providing contemporaneous notice of discretionary rate increases to account holders. The majority interprets Comment 1's use of the word "specific" ("No

---

[4]In fact, the third example of Comment 1 is arguably a default situation: when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum.

[5]There are no doubt many instances where, unlike here, a creditor changes a consumer's interest rate upon his default and is required to provide a change-in-terms notice. There, Comment 3 would apply to determine the timing of the requisite change-in-terms notice. Here, however, we need not consider the issue of proper timing under Comment 3 because Chase is exempted from the requirement of additional notice by Comment 1.

notice of a change in terms need be given if the *specific change* is set forth initially . . . . [N]otice must be given if the contract allows the creditor to increase the rate at its discretion but does not include *specific terms* for an increase . . . ," 12 C.F.R. § 226.9(c), cmt. 1 (emphasis added)) to cover only circumstances in which the creditor has disclosed the exact change and the precise terms, so that additional notice would be redundant. I cannot interpret the comment so narrowly. It is certainly more than reasonable to find that Chase has satisfied it here.

In the Cardmember Agreement, Chase disclosed the three conditions that McCoy had to comply with in order to remain eligible for his Preferred rate. Violation of these conditions was necessary (even if not sufficient) for Chase to take away McCoy's Preferred rate. The Agreement disclosed the maximum interest rate that could apply: the maximum Non-Preferred rate described in the Pricing Schedule. It also disclosed the time at which the new rate would become effective: it would "apply to existing as well as new balances and [would] be effective with the billing cycle ending on the review date." Finally, Chase disclosed that it might take certain steps to investigate McCoy's compliance with the required conditions, including obtaining credit reports on him from consumer credit bureaus. Semantic contortions aside, I believe that these statements set forth a specific change and disclosed the specific terms for that change. *Accord Swanson*, 566 F. Supp. 2d at 825.[6] Chase's disclosure thus fulfills the obvious purposes of Comment 1.

---

[6]The fact that Chase did not disclose the precise factors it might use to determine not to exercise its discretion to impose the maximum increase should not offend Comment 1. The Board has indicated that contemporaneous notice is not required when a creditor decides to reduce interest rates. *See* 12 C.F.R. § 226.9(c)(2). A creditor's decision to decline to impose the maximum increase has the same effect on a consumer as deciding to reduce interest rates, and a similar rationale would apply to justify the position that the creditor need not disclose in advance the exact cir-

The majority buttresses its conclusion to the contrary by reference to Comment 1's examples, saying that "[a]ll three examples pertain to rate increases that are spelled out in card-member agreements and ascertainable by the consumer without additional notice." In contrast, it says, "the increase here occurs at Chase's discretion and the most pertinent 'specific terms for an increase' — the actual amount of the increase and whether it will occur — are not disclosed in advance."

At the outset, the majority is wrong in assuming that the three examples do not involve any discretion on the creditor's part regarding whether to apply an increase and if so, how much of one. For instance, when analyzing the third example, the majority reads much into the Board's use of the phrase "an increase that occurs" instead of one that "may occur," concluding that the Board thereby meant that the increase would be automatic and non-discretionary. The Board does not specify in any of the examples that the increase must be of a definite amount that is ascertainable by the consumer without additional notice. This might be a valid assumption with regard to the first example (the variable-rate plan), but such ascertainability is not an essential element of the second and third examples. Neither states one way or the other whether they involve a precise and automatic increase.

Further, I am not persuaded, as the majority is, that the Board had in mind a standard of complete redundancy when specifying examples of situations where additional notice would not be required. To the contrary, the Board specifically recognized that there may be situations in which the creditor

cumstances in which it would decide not to impose the maximum increase. The majority says this argument proves too much because it would apply equally to an example in which Comment 1 specifically requires notice ("when an increase may occur under the creditor's contract reservation right to increase the periodic rate"). I disagree that this argument would apply equally to that example because in that example, there does not appear to be a specified maximum rate.

retains some discretion (as long as "specific [']terms['] for an increase" are disclosed, 12 C.F.R. § 226.9(c), cmt. 1) and additional notice is not required.[7] If discretion is sometimes permissible, then precise rates certainly may not always be ascertainable by the consumer before the fact.

As a final matter, I would just note that the interpretation of Regulation Z shared by Chase and the Board seems to me to be consistent with the purpose of TILA. *See Anderson Brothers*, 452 U.S. at 219-20 ("The purpose of the TILA is to promote the 'informed use of credit' by consumers.") (quoting 15 U.S.C. § 1601), 222 ("The Board's position is supported by the legislative history of both the TILA and the 1980 Act, and we hold that it is a permissible interpretation of the term 'security interest' as used in the TILA."); 15 U.S.C. § 1604 ("The Board shall prescribe regulations to carry out the purposes of this subchapter."). McCoy had all the information he needed in order to enjoy the informed use of his credit. He knew the conditions in which Chase could increase his interest rate and those conditions were under his control. He also knew the highest possible interest rate that could apply in the event of his default. I find it difficult to believe that McCoy, or any other cardmember, would have been better off had he known the precise formula that Chase uses to determine whether or how much to raise his interest rate. It seems extremely doubtful that in deciding whether to pay his bills on time, McCoy might have attempted to use that formula to determine what his chances were of keeping the same interest rate. Unlimited discretion to increase consumers' interest rates is something that TILA was intended to protect them against. I do not believe that discretion to decline to increase a consumer's rate all the way up to the permissible maximum, such as Chase had in this case, poses a similar danger. There is nothing irrational or oppressive in allowing a creditor a degree of discretion in dispensing mercy.

---

[7]For example, as here, where there is a warning of the range and potential extent of an increase.

Because I would find that McCoy has not stated a claim for a violation of TILA, I would not reach his state law claims.

For all of these reasons, I respectfully dissent.