**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

AUSTIN MILLIKEN,

       *Plaintiff - Appellant*,

v.

BANK OF AMERICA, N.A.,

       *Defendant - Appellee.*

No. 24-4498

D.C. No.
3:23-cv-03709-
AMO

OPINION

Appeal from the United States District Court
for the Northern District of California
Araceli Martinez-Olguin, District Judge, Presiding

Argued and Submitted August 19, 2025
San Francisco, California

Filed December 29, 2025

Before: Morgan B. Christen, Daniel A. Bress, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Bress

# SUMMARY[*]

## Credit Card Accountability Responsibility and Disclosure Act

The panel affirmed the district court's judgment dismissing under Fed. R. Civ. P. 12(b)(6) Austin Milliken's lawsuit alleging that Bank of America's formula for calculating the interest rate for variable-rate credit cards violates the Credit Card Accountability Responsibility and Disclosure Act of 2009 (CARD Act).

Under the CARD Act, credit card issuers are generally not permitted to "increase any annual percentage rate, fee, or finance charge applicable to any outstanding balance" on a consumer's credit card account. 15 U.S.C. § 1666i-1(a). However, the prohibition does not apply to "an increase in a variable annual percentage rate in accordance with a credit card agreement that provides for changes in the rate according to operation of an index that is not under the control of the creditor and is available to the general public." *Id.* § 1666i-1(b)(2).

The panel held that Milliken's credit card agreement with Bank of America changes rates "according to operation of an index that is not under the control of the creditor," § 1666i-1(b)(2), and thus does not violate the CARD Act. Bank of America calculates percentage rates for its variable-rate credit cards during each billing cycle by adding the value of the U.S. Prime Rate on the last day of each month to a constant margin set by the bank. Only two values

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

affect Bank of America's variable rate calculation: (1) the constant margin and (2) the value of the Prime Rate at the end of the month. By the terms of Milliken's agreement, any increase or decrease in the Prime Rate results in an identical increase or decrease in the variable rate. The Prime Rate is publicly available and not under Bank of America's control. Accordingly, Milliken's credit card agreement with Bank of America does not violate the CARD Act.

## COUNSEL

Claire E. Tonry (argued), Knoll D. Lowney, and Alyssa L. Koepfgen, Smith & Lowney PLLC, Seattle, Washington; Breanna Van Engelen and Shayne C. Stevenson, Hagens Berman Sobol Shapiro LLP, Seattle, Washington; for Plaintiff-Appellant.

Danielle O. Morris (argued), O'Melveny & Myers LLP, Newport Beach, California, for Defendant-Appellee.

**OPINION**

BRESS, Circuit Judge:

We consider whether a variable-rate credit card agreement complies with federal law.

I

In the wake of the 2008 financial crisis, Congress passed the Credit Card Accountability Responsibility and Disclosure Act of 2009 (CARD Act). Pub. L. No. 111-24, 123 Stat. 1734 (2009). Under the CARD Act, credit card issuers are generally not permitted to "increase any annual percentage rate, fee, or finance charge applicable to any outstanding balance" on a consumer's credit card account. 15 U.S.C. § 1666i-1(a). But there are exceptions. *See id.* (specifying that the prohibition applies "except as permitted under subsection (b)"). Relevant here, the prohibition does not apply to "an increase in a variable annual percentage rate in accordance with a credit card agreement that provides for changes in the rate according to operation of an index that is not under the control of the creditor and is available to the general public." *Id.* § 1666i-1(b)(2).

Like many credit card issuers, Bank of America calculates percentage rates for its variable-rate credit cards during each billing cycle by adding the value of the U.S. Prime Rate on the last day of each month to a constant margin set by the bank. The Prime Rate is "the base rate on corporate loans posted by at least 70% of the 10 largest U.S. banks," which is, in turn, keyed to the Federal Funds Rate set by the Federal Reserve. Bank of America has no control over the Prime Rate, and if the Prime Rate increases or decreases between the beginning of the billing cycle and the

last day of a month, the cardholder's total interest rate will increase or decrease by the same amount.

Seeking to take advantage of the statutory exception in § 1666i-1(b)(2), Bank of America offers its customers variable-rate credit cards with rates calculated based on the following formula contained in their credit card agreements:

> Variable Rates are calculated by adding together an index and a margin. This index is the highest U.S. Prime Rate as published in the "Money Rates" section of *The Wall Street Journal* on the last publication day of each month. . . . An increase or decrease in the index will cause a corresponding increase or decrease in your variable rates on the first day of your billing cycle that begins in the same month in which the index is published.

If the billing cycle begins on a day before the last day of the month, then the new U.S. Prime Rate applies to the interest rate on the outstanding balance for the days in the billing cycle preceding the last day of the month. That is, if the Prime Rate changes after the start of the billing cycle, the rate published on the last day of the month is applied to outstanding balances for the entire billing cycle. And the amount of that change will be determined by the change in the Prime Rate.

As the parties explain it, imagine that a customer's billing cycle renews on the fifteenth day of each month. In that case, the applicable Prime Rate for the rate charged to the customer's outstanding balance between April 15 and May 15 is the Prime Rate published on April 30 (or the last publication day of the month). This Prime Rate, applicable

to the customer's May 15 statement, applies for purchases made between April 15 and 30, even if the Prime Rate increased on a day after April 15.  It's not all downside for the cardholder, however, as this policy also applies to decreases in the Prime Rate.  So if the Prime Rate had instead decreased between April 15 and April 30, the cardholder's rate would have been lowered correspondingly.  And that lower rate would be applied to the entire outstanding balance for the billing cycle.

In this case, plaintiff Austin Milliken was caught on the wrong side of a rate change.  During the relevant time period, from March 2022 through July 2023, the Federal Reserve raised the Federal Funds Rate ten times to curb inflation, causing the Prime Rate to more than double from a low of 3.25% to a high of 8.25%.  In response to this increase, rates on Bank of America's variable-rate credit cards changed accordingly, and those higher rates were applied to the outstanding balances incurred before the rate increases. Unhappy with this outcome, Milliken filed this class action lawsuit.  He alleged that Bank of America violated the CARD Act and advanced a collateral claim under California's Unfair Competition Law.  Cal. Bus. & Prof. Code § 17200, *et seq.*

The district court dismissed the lawsuit under Rule 12(b)(6), concluding that Bank of America's formula for calculating the interest rate for variable-rate credit cards did not violate the CARD Act because it fell within the § 1666i-1(b)(2) exception.  Milliken appeals.  Our review is de novo. *Chang v. United States*, 139 F.4th 1087, 1092 (9th Cir. 2025).

## II

Interpreting § 1666i-1(b)(2) in context and based on its plain and natural meaning, *see, e.g.*, *N.L. v. Credit One Bank,*

*N.A.*, 960 F.3d 1164, 1167 (9th Cir. 2020), Milliken's credit card agreement with Bank of America fits within the CARD Act's variable rate exception.  Although rate increases may generally not be applied to outstanding balances, 15 U.S.C. § 1666i-1(a), the exception in § 1666i-1(b)(2) provides that issuers may increase a variable rate "in accordance with a credit card agreement that provides for changes in the rate according to operation of an index that is not under the control of the creditor and is available to the general public." In the agreement before us, the only variable that affects the interest rate (setting aside the constant margin) is the value of the Prime Rate, which is publicly available and not under Bank of America's control.  So any increase or decrease in the Prime Rate results in an identical increase or decrease in the variable rate.   In other words, any change in the cardholder's interest rate is made "according to" a change in the Prime Rate.  15 U.S.C. § 1666i-1(b)(2).

Milliken sees matters differently.  He first argues that since the effective value of the Prime Rate can change day-to-day, retroactively setting the variable rate for the entire billing cycle based solely on the rate's effective value at the end of the month is not doing so "according to operation" of the Prime Rate.  But it is § 1666i-1(a) that prohibits applying increased rates to outstanding balances;  § 1666i-1(b)(2) carves out an exception to this.  And § 1666i-1(b)(2) requires only that the interest rate change "according to operation of an index," not the operation of an index on a particular date.  Nor does it prohibit applying this rate to outstanding balances.  Instead, as we explained, it is an exception to a prohibition against doing just that.

Here, only two values affect Bank of America's variable rate calculation: (1) the constant margin and (2) the value of the Prime Rate at the end of the month.  Again, by the terms

of Milliken's agreement, any increase or decrease in the Prime Rate results in an identical increase or decrease in the variable rate, and Bank of America has no control over either the Prime Rate or the underlying Federal Funds Rate. Therefore, any change in the interest rate under Bank of America's credit card agreement is made "according to" the corresponding change in the effective value of the Prime Rate between the beginning of the billing cycle and the end of the month. Milliken's argument effectively reads an additional, stricter conformity requirement into the statute—a requirement the statute does not impose.

Milliken responds by arguing that "one cannot effectively use [the Prime Rate] without also specifying a date or period," as the Prime Rate "only 'operates' as an index when both the percentage rate and the 'Effective Date' are taken together." True enough. But it's hard to see how this changes things, as Bank of America's credit card agreement *does* specify an effective date—namely, the Prime Rate "on the last publication day of each month." The mere fact that *a* date is needed does not mean that § 1666i-1(b)(2) requires Bank of America to calculate rates using any particular date or to update its rates every day.

Milliken cites our decision in *McCoy v. Chase Manhattan Bank*, 559 F.3d 963 (9th Cir. 2009), *rev'd and remanded on other grounds sub nom. Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011), to argue that the term "according to" in § 1666i-1(b)(2) requires stricter adherence to the referenced index. But *McCoy* is inapposite. In *McCoy*, we interpreted a portion of the Delaware Banking Act that "authorizes rates of interest that 'vary in accordance with a schedule or formula.'" *McCoy*, 559 F.3d at 970 (quoting Del. Code tit. 5, § 944). We held that the Delaware Banking Act did not "authorize rate increases that are

discretionary and vary according to criteria . . . where those criteria are not specified in a schedule or formula contained in the agreement." *Id.*

But Bank of America's method for calculating interest rates is not "discretionary." Milliken's credit card agreement left no discretion for the bank to determine whether a change in the Prime Rate would affect the variable interest rate or what effect such a change would have. And unlike in *McCoy*, this arrangement is very much "specified . . . in the agreement." *Id.* There is no allegation that consumers were not informed as to the terms of the agreement.

The Consumer Financial Protection Bureau's (CFPB) implementing regulation to the CARD Act, Regulation Z, and its accompanying commentary also cut against Milliken's interpretation. As Regulation Z states, "[a] card issuer may increase an annual percentage rate when . . . [t]he increase in the annual percentage rate is due to an increase in the index" that "is not under the card issuer's control." 12 C.F.R. § 1026.55(b)(2). Nothing in the regulation requires an issuer to change the rate based on the day-to-day movements of such an index or prohibits applying the changed rate to the whole billing cycle. Indeed, to the contrary, the CFPB expressly contemplated that banks can set the effective date for rate changes and that effective dates can be based on billing cycles, as the guidance allows credit card agreements to specify that "the variable rate will be calculated based on the index value on a specific day (such as the last day of a billing cycle)." 12 C.F.R. § 1026.55(b)(2) cmt. 2(ii). That is what Bank of America's credit card agreement does.

In response, Milliken argues that the CFPB's commentary also states that "[o]nce an increased rate has

gone into effect, the card issuer cannot calculate interest charges based on that increased rate for days prior to the effective date." *Id.* § 1026.55(b) cmt. 2(ii). But this commentary is not applicable here, because it specifically relates to "the requirements in § 1026.9(c) and (g) that creditors provide written notice at least 45 days prior to the effective date of certain increases." *Id.* Section 1026.9(c) only applies when there is a "significant change in account terms," *id.* § 1026.9(c)(2)(i)–(ii), such as a change in Bank of America's formula for calculating rates. Indeed, the section specifically notes that it does not apply to the "according to operation of an index" exception at issue in this case. *Id.* § 1026.9(c)(2)(v)(C). And § 1026.9(g) relates to an "[i]ncrease in rates due to delinquency or default or as a penalty," which is not at issue here. *Id.* § 1026.9(g).

Milliken suggests that under the bank's interpretation, card issuers will be able to "unlawfully charge its customers millions more in retroactive interest," and that cardholders will be unable to make informed decisions if they do not know the applicable interest rate beforehand. But setting aside that Bank of America's agreement complies with the CARD Act's express terms, this argument fails to consider that Bank of America's agreement will benefit cardholders if interest rates decrease. Indeed, Milliken himself benefited from such rate decreases in the past, and unsurprisingly, he does not challenge those decreases here. A consumer protection statute, the CARD Act puts specified limits around variable rate increases while ensuring that cardholders like Milliken are adequately informed about the terms and conditions of their credit card agreement. The statute does not insulate customers from the consequences of otherwise lawful risks that they knowingly bear.

Milliken also contends that Bank of America's calculation method does not rely on an index "not under the control of the creditor" because the bank raises rates on the "first day of [each] billing cycle." Milliken suggests that since Bank of America has discretion to set and adjust billing cycles for each cardholder, it could potentially increase the length of a billing cycle after an interest rate increase to retroactively lock in those higher interest rates.

This argument is unpersuasive. As an initial matter, Milliken does not allege that Bank of America has manipulated its billing cycles for some improper purpose. But even if we assume that this type of manipulation is possible, the event that triggers an interest rate increase or decrease under Bank of America's credit card agreement is a change in the Prime Rate—not the billing cycle. Regardless of the billing cycle, the cardholder's total rate will not increase or decrease unless the Prime Rate does so. Therefore, the rate more properly changes "according to" the Prime Rate. And neither party here disputes that the Prime Rate itself is "an index that is not under the control of the creditor."

Milliken's argument about billing cycles is also undermined by the fact that issuers are limited in their ability to adjust those cycles. Regulation Z states that billing cycles may not exceed a "quarter of a year." 12 C.F.R. § 1026.2(a)(4). They must also be equal in length. *Id.* And while banks may "occasionally" change a customer's billing cycle, *id.* § 1026.2(a)(4) cmt. 3, the regulations do not contemplate routine billing cycle changes. Indeed, a change in billing cycle would generally require the card issuer to give notice to the cardholder beforehand. *Id.* § 1026.9(c)(2). And Bank of America expressly represents in its briefing that "a card-issuer may not give itself the right, in its credit card

agreement, to choose from cycle-to-cycle the date on which it measures the index rate." For these reasons, the effect of any potential billing cycle manipulation—which, again, Milliken does not allege here—would be limited, and it does not detract from Bank of America's express compliance with § 1666i-1(b)(2).

The CFPB's commentary to Regulation Z further refutes Milliken's point. The commentary lists three examples of when "an index is under the card issuer's control": (1) the "index is the card issuer's own prime rate or cost of funds," (2) the "variable rate is subject to a fixed minimum rate or similar requirement that does not permit the variable rate to decrease consistent with reduction in the index," and (3) the "variable rate can be calculated based on any index value during a period of time." 12 C.F.R. § 1026.55(b)(2) cmt. 2. The common thread tying these three examples in the commentary together is that they allow the card issuer to exercise its discretion to reap the upsides of changes in the index, while preventing the cardholder from doing the same.

Bank of America's use of the Prime Rate is different. The Prime Rate is not Bank of America's own rate. The agreement permits the variable rate to decrease with the Prime Rate. The effective value can only be calculated based on one date—the last publication day of the month. And unlike the CFPB's examples, Bank of America's calculation method neither leaves any discretion to the bank nor prevents cardholders from obtaining the benefits of decreased interest rates.

Because Milliken's credit card agreement with Bank of America changes rates "according to operation of an index that is not under the control of the creditor," 15 U.S.C.

§ 1666i-1(b)(2), we hold that it does not violate the CARD Act.

**AFFIRMED.**